IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 17, 2003 Session

# FERGUSON HARBOUR INCORPORATED v. FLASH MARKET, INC.

**A Direct Appeal from the Circuit Court for Sumner County**
**No. 21941-C     The Honorable C. L. Rogers, Judge**

––––––––––––––––––––

**No. M2002-00750-COA-R3-CV - Filed April 14, 2003**

––––––––––––––––––––

This case involves a dispute over the validity of a contract. Appellant claims that its signature on the contract was obtained through economic duress and that the contract is, therefore, void. The trial court found for Appellee, awarding compensatory damages and attorney's fees. Appellee contends that the award of attorney's fees was unreasonably low. We affirm the trial court's award of compensatory damages. On the issue of attorney's fees, we reverse the order of the trial court and remand this case for a determination of reasonable attorney's fees consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

Allan B. Thorp; Nanette L. Wesley, Memphis, For Appellant, Flash Market, Inc.

Stephen C. Knight, Nashville, For Appellee, Ferguson Harbour, Incorporated

## OPINION

On or about July 31, 1994, a truck owned by non-party Bob Taylor Trucking purchased diesel fuel from Flash Market, Inc.'s ("Flash," "Defendant," or "Appellant") convenience store located at 409 E. Service Road in West Memphis, Arkansas. Due to no fault of Flash, the truck leaked diesel fuel onto Flash's property.

There is dispute in the record as to whether Flash called Ferguson Harbour, Inc.'s[1] ("FHI," "Plaintiff," or "Appellee") emergency line or whether FHI was dispatched to Flash's location by the EPA, or by Bob Taylor Trucking. This dispute of fact will be discussed in more detail below. What is not in dispute is the fact that FHI's crew cleaned up the diesel fuel spill at Flash. It is also undisputed that FHI obtained Flash's on-site manager, Douglas McMahan's, signature on an emergency field agreement (the "Agreement"). The circumstances surrounding the reason why Mr. McMahan signed the Agreement are, however, in dispute and will be discussed in more detail *infra*. The Agreement reads as follows:

<u>EMERGENCY FIELD AGREEMENT TO PERFORM WORK</u>

This Agreement, effective this 31 day of July, 1994, by and between Ferguson Harbour Incorporated ("FHI") and Flash Market ("CLIENT").

The parties to this Agreement, in consideration of the mutual covenants and stipulations set out, agree as follows:

CLIENT contracts with FHI to perform the following described services ("WORK") at FHI's rate of compensation set forth in the rate schedule attached hereto as Exhibit A:

Respond to diesel spill at 409 E. Service Rd., W. Memphis, AR.

CLIENT assigns Purchase Order Number _ to the WORK.

CLIENT shall be responsible for securing all necessary approvals, permits, and easements required for the WORK to be performed.

CLIENT warrants that it holds clear title to all waste to be treated, stored and/or disposed and is under no legal restraint which would prohibit the treatment, storage and/or disposal of such waste. At no time shall FHI assume any ownership interest whatsoever in such waste.

CLIENT shall assume full responsibility for compliance with the provisions of all applicable federal, state, and local laws. FHI shall not be held responsible for any loss or damage to CLIENT'S property. CLIENT agrees to pay FHI for a minimum of 4 hours. Client also agrees to pay FHI for all reporting, work plans, health and safety plans, final reports, etc. as required by federal, state or local regulations, or to finalize the project.

FHI agrees to perform in accordance with its rate schedule until such WORK is completed, or, in the alternative, it is ordered in writing by CLIENT to stop WORK. FHI may at any time

---

[1] Ferguson Harbour, Inc. specializes in decontamination, and removal of hazardous waste. They advertise in the Yellow Pages and list a 24-hour emergency number.

delegate the performance of the WORK, but such delegation shall not relieve FHI of its responsibilities hereunder.

CLIENT authorizes the WORK to be done and agrees that payment is due upon receipt of invoice. If payment is not made within ten (10) days of the invoice date, then a service charge of 1 ½% a month is due on any unpaid balance. In the event payment is not made and this Agreement is placed in the hands of an attorney for collection, CLIENT agrees to pay all collection costs, including reasonable attorney fees.

This Agreement may be terminated by either party upon 48-hours written notice. In the event of termination, CLIENT shall compensate FHI for all work performed prior to termination.

In witness whereof, the parties have executed this Agreement by the signature of their duly authorized employees or representatives on the day and year written above.

| CLIENT | FERGUSON HARBOUR INCORPORATED |
|---|---|
| By: /s/ Douglas McMahan | By: /s/ Dale Ozien |
| Title: Mgr. | Title: Division Manager |

The Agreement obligates Flash to pay FHI for the clean-up. Disputing the legality of the Agreement, Flash refused to pay for FHI's services.[2] On August 25, 2000, FHI filed a General Sessions Civil Summons against Flash for $2,514.15. After denying a Motion to Dismiss for improper venue, the General Sessions Court entered judgment in favor of FHI for $10,000 on July 16, 2001.

Flash appealed to the Circuit Court of Sumner County. On September 12, 2001, Flash filed a Motion to Dismiss for Improper Venue, along with supporting documentation. On October 17, 2001, FHI filed a response to Flash's Motion to Dismiss. Flash's Motion to Dismiss was heard on October 19, 2001 and an Order denying the Motion was entered on November 13, 2001.

---

[2] An invoice dated August 16, 1994 was sent to Flash's West Memphis location. The invoice reflects a total charge of $2,514.15 due within 10 days of the date of the invoice and subject to a 1.5% monthly finance charge thereafter.

The matter proceeded to trial on February 27, 2002. By Order dated March 8, 2002, judgment was entered for FHI for $7,908, including attorney's fees in the amount of $2,000. On April 10, 2002, FHI filed a Motion to Alter or Amend Judgment or for Relief from Judgment, requesting additional attorney's fees. Flash filed a response to FHI's Motion on May 1, 2002. The Motion to Alter or Amend was heard on May 3, 2002 and was subsequently denied by Order dated May 9, 2002.

Flash appeals from the trial court's Order and raises four issues for our review as stated in the brief:

> I. The trial court erred when it ruled there was an enforceable contract.
>
> II. The trial court erred by ruling the statute of limitations had not run.
>
> III. The trial court erred by allowing inadmissible hearsay evidence to toll the running of the statute of limitations.
>
> IV. The trial court erred by not holding the lawsuit barred by laches.

FHI raises one additional issue for our review: Whether the trial court abused its discretion by failing to apply the applicable legal standard for determining reasonable attorneys' fees.

### The trial court erred when it ruled there was an enforceable contract

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13.

Flash contends that the Agreement is unenforceable due to the fact that it was signed under economic duress. Specifically, Flash asserts that FHI's crew blocked Flash's fuel islands until McMahan signed the Agreement. At the trial, McMahan testified, in relevant part, as follows:

> Q. Did you [Mr. McMahan] have any other conversations with the man in charge for Ferguson Harbour?
>
> A. Yes, sir.

Q. Tell me about those conversations.

A. Well, they [FHI] were close to getting through with cleaning up the spill by the time I got there. They had it swept up in little tracks. I told the gentleman–he told me that I had to sign a piece of paper or they [FHI] couldn't leave the parking lot. I told him I wasn't signing anything because it's not our [Flash's] spill and we're [Flash] not responsible for it. We had several discussions along those lines.

Q. When you say you had several discussions, can you go into more detail.

A. Well, he couldn't move his equipment until I signed the paper, and I wasn't signing the paper because, at that particular time, I was under the impression that, my signing the paper, I was saying I was responsible for the diesel spill, which I was not.

Q. Where was his truck and his equipment, what he had out there? Was it interfering with your being able to do business?

A. The truck, the equipment, and plus the fact they [FHI] had the diesel island taped off, we [Flash] were actually shut down at the time.

Q. Would you say that you and the man with Ferguson Harbour were shouting at each other about it?

A. Yes, sir, I would. We were kind of like two people bumping heads, I guess. He couldn't move his equipment. I couldn't sell anything and I wasn't signing anything.

Q. Did you tell him anything about whether you would pay for it [the clean-up]?

A. Yes, sir, I told him that I wasn't paying the bill. If I signed it, I felt like I was responsible for getting it, it was our bill.

*                              *                              *

Q. When you had this heated discussion where you said you weren't going to pay and he wasn't going to move, what did you do?

A. I went inside and called Mr. Patterson.

Q. Is Mr. Patterson the president of the company [Flash]?

A. Yes, sir.

On cross-examination, Mr. McMahan testified, in pertinent part, as follows:

Q. When you [Mr. McMahan] arrived, you saw them [FHI's crew] working there?

A. Yes, sir.

Q. They were working on your property, Flash Market's property?

A. Yes, sir.

Q. They were cleaning an oil spill that was on that property?

A. Yes, sir.

Q. You watched them work. When did he [FHI's employee] come in and ask you to sign the document?

A. When did he come in and ask me to sign the document? After he was finished.

Q. After he was finished? So you let them finish?

A. I went and talked to the gentleman as soon as I got there and asked him who sent them out, and all that kind of stuff, and told him I wasn't paying any bills for picking up the diesel fuel.

Q. You told him that later, didn't you?

A. I told him that at the time I arrived there.

Q. So your testimony is you arrived on the scene. You saw these fellows working on your property and you walked up to them and said, "I'm not paying for any of this"? Is that what you're saying?

A. No, sir. What I said was, "Who sent you out here," and he said the EPA, and I said, "I'm not paying for any spills that's [sic] not mine."

    *                               *                               *

Q. ...Are you alleging to this Court that you were forced to sign that document, Mr. McMahan?

A. I was told to sign that document by the president of the company.[3]

Q. By which president?

A. Mr. Patterson

    *                               *                               *

Q. Was it your understanding that Mr. Patterson knew that it [the document] was a contract to obligate Flash Market for the cleanup when he told you to sign it?

A. I have no idea what Mr. Patterson knew.

Q. He pretty much knew what was going on when he told you to sign it, didn't he?

A. All I know is Mr. Patterson told me to sign the paper to get the people off the lot so we could continue doing business.

    *                               *                               *

Q. Now, was this person from Ferguson Harbour holding a gun to you or anything like that?

A. No, sir.

    *                               *                               *

Q. ...Couldn't you [Mr. McMahan] have called the police?

A. Why would I want to call the police?

---

[3] We note that, in his Affidavit that was introduced at trial as Exhibit 7, Mr. McMahan claims he signed the Agreement "only in order to cause [FHI] to unblock the fuel islands...." Mr. McMahan's Affidavit makes no mention of his being instructed to sign the Agreement by Mr. Patterson.

Q. Well, if a man is on your property and you don't want him there and he's refusing to move and he's keeping you from doing business, wouldn't it be logical to call the police?

A. The EPA officer that was there is a Sheriff's Department member.

Q. Why didn't you complain to him?

A. What would I complain of, the guy refused to move his equipment?

Q. Whatever you're complaining about now that you're saying forced you to sign this contract against your will.

A. Did I say I was forced to sign the contract against my will?

Q. That's what you're–

A. Or that Patterson told me to sign the contract so we could continue doing business?

Harold Patterson, president of Flash, also testified at the trial. The relevant portion of his testimony reads as follows:

Q. Did he [FHI's employee] tell you [Mr. Patterson] that he wouldn't remove his equipment–

A. Yes, sir, he had–he had our diesel lanes blocked. We had trucks lined up trying to get fuel there and he had them blocked off with his truck and the yellow-looking tape around them and would not remove it unless we signed this form. It's a big confusion at the truck stop and you have the truckers trying to fuel and can't get fuel.

Q. Did you have truckers there trying to get fuel?

A. Yes, sitting in line trying to get to the fuel lines.

Q. Did you tell Mr. McMahan to sign the document?

A. Yes, sir, sure did.

On cross-examination, Mr. Patterson testified, in pertinent part, as follows:

-8-

Q. ...You [Mr. Patterson] had every opportunity to read that contract if you wanted to, didn't you?

A. I agree.

Q. All you had to do was ask for it. You chose not to and you instructed Mr. McMahan to go ahead and sign it?

A. Yes, sir, sure did.

FHI's only witness at trial was Keith F. Bailey, the president and CEO of FHI. Mr. Bailey was not present at Flash the night of the spill and offered no rebuttal to the testimony proffered by Messrs. McMahan and Patterson. However, the trial court, in its ruling from the bench, notes some problems with the credibility of Flash's witnesses:

> The reason I'm [the court] concerned about that credibility is, in Exhibit 8,[4] at that time, the defendant was claiming that Ferguson Harbour was contacted by Taylor Trucking Company to come clean up the diesel fuel. Today, the testimony from the defendant is that Ferguson Harbour was contacted by the EPA.

> Again, Exhibit 8,[5] demonstrates that the defendant, back in April of 2001, in that letter, disclaimed any knowledge that the person signing the contract for Flash Market was an employee, didn't know who it was, didn't know anything about him. Today, that's the manager who testified here today and that signed it at the direction of the president.

At the close of the trial, the trial court issued its ruling from the bench. On the issue of whether there was an enforceable contract, the court ruled as follows:

> Based on the evidence, the Court finds certain facts to be that there, in fact, was a contract signed between the parties dated July 31, 1994, providing for certain work to be performed and that the total cost under that contract is $2,514.15.

---

[4] Exhibit 8 is a letter sent from Flash's attorney to FHI's attorney. The relevant portion of the letter is as follows: "Subsequent to the spill, parties from Taylor Trucking contacted Ferguson Harbour asking them to respond to the location to clean up the diesel fuel."

[5] The pertinent section of Exhibit 8 reads as follows: "The signature contained on the Emergency Field Agreement to Perform Work is unknown to Flash Market and is not a Flash Market employee regardless of what it states on the document itself."

The contract further provides for one-and-a-half percent interest if not paid within 10 days of the invoice and also provides for reasonable attorney's fees.

From our review of the entire record in this case, we, too, find that there was a valid and enforceable contract between FHI and Flash. The preponderance of the evidence simply does not support Flash's contention that Mr. McMahan's signature was obtained under economic duress. Rather, the weight of the evidence indicates that Mr. Patterson, the president of Flash, was on-site at the time the Agreement was signed and, despite the opportunity to review the document, did not do so. In terms of economic duress, there is no proof in evidence to show that Flash was in danger of losing any business from FHI's alleged blocking of the gas pumps. In fact, Mr. Patterson's testimony indicates that the trucks "lined up" and waited for the pumps to reopen. Furthermore, Mr. McMahan's testimony indicates that there was an EPA officer on-site the night of the spill. Rather than sign the Agreement, Flash could have asked for the EPA officer's aid in removing FHI's equipment. In fact, at the close of proof, the trial court points this option out to Flash:

> I'm [the court] not buying into an argument that you [Flash] did it [signed the Agreement] just to clear your gas pumps. I think I'd be telling the EPA man to have them removed or calling the police, one or the other, if I truly did not want to sign the contract.

We concur with the trial court's analysis. For that, and the foregoing reasons, we affirm the trial court's finding that there was a valid and enforceable contract between FHI and Flash.

## The trial court erred by ruling that the statute of limitations had not run

As noted above, this suit was initially filed on August 25, 2000. The applicable statute of limitations for FHI's claim is six (6) years. *See* T.C.A. § 28-3-109(a)(3). It is well settled that the cause of action accrues when a party repudiates a contract or clearly indicates that it refuses to perform. Flash asserts that the statute of limitations began to run on the night the Agreement was signed, July 31, 1994. Specifically, Flash asserts that it repudiated the Agreement immediately after signing and, therefore, more than six years had elapsed when FHI filed suit on August 25, 2000. Both Messrs. McMahan and Patterson testified that they made it clear to FHI's on-site employee that Flash would not be responsible for the clean-up bill. Mr. Patterson testified as follows:

> Q. Did you [Mr. Patterson] tell him [FHI's employee] whether or not you would pay for the services?
>
> A. I told him we would not pay for it.

-10-

In the alternative, Flash argues that, regardless of any repudiation on the night of July 31, 1994, they clearly repudiated on or about August 16, 1994, when they received the invoice from FHI. On this theory, Mr. Patterson testified as follows:

> Q. When you [Mr. Patterson] got the invoice, what did you do?
>
> A. Well, I–I called Ferguson Harbour and explained to them the situation, you know, this is not our invoice...

On cross-examination, Mr. Patterson continued as follows:

> Q. Did you make any effort? Did you ever write to Ferguson Harbour and tell them in a letter, "Look, this is not our obligation. This is somebody else's obligation. You've billed the wrong person?" You never did that, did you?
>
> A. I talked with them one time on the phone and that's the only time I ever talked with them about this.
>
> Q. The only time you ever talked to them?
>
> A. Or anybody in our office about it, that I know of.

On the question of when, exactly, Flash clearly refused to pay for FHI's services, Mr. Keith Bailey, president of FHI, testified as follows:

> Q. After you sent the invoice, did you receive anything at all by way of any communication, whether verbal or written or any form of communication, from the defendant objecting to it, telling you that they didn't owe it?
>
> A. No, sir.
>
> Q. In fact, after you sent the invoice and didn't get it for awhile, did somebody on behalf of FHI contact them and ask them to pay it?
>
> A. Yes, sir.
>
> Q. Did they pay it?
>
> A. No, sir.
>
> Q. Did they promise to pay it?

A. Yes, sir.

\*                  \*                  \*

Q. What is your policy with respect to filing lawsuits?

A. We work with our clients. They say they're going to pay, we work with them.... Finally, you know, when it gets to the point where we can't believe what our clients are saying anymore, then we have to pursue legal action, and that's what we did in this case.

\*                  \*                  \*

Q. ...When you first learned that this defendant was refusing to pay your invoice, would it have been within the first year of the date that the project was completed or sometime after that?

A. No, it was way after that.

\*                  \*                  \*

Q. ...to your knowledge, did anyone on behalf of Flash Market ever–up until we got into the courtroom last time, did anyone on behalf of Flash Market ever tell you that they were repudiating the contract, that they were challenging the contract, or anything like that?

A. No, sir. If we had a written document or something that came back, whatever, I would have sat down with them and said, "Hey, let's work through this."

Q. Did that happen?

A. No, sir.

Obviously there is dispute in the record as to whether Flash repudiated the Agreement immediately upon signing and/or immediately upon receipt of the invoice, or whether negotiations continued for some time until it became clear that Flash was not willing to pay FHI.

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor, while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W. 2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837

-12-

(Tenn. Ct. App. 1997).  The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.  ***See id.; In re Estate of Walton v. Young***, 950 S.W. 2d 956, 959 (Tenn. 1997).

From the record before us, it is clear that the trial court accepted the testimony of Keith Bailey but had doubt as to the credibility of Messrs. Patterson and McMahan:

> The Court further finds that, after the work was performed, an invoice was sent on August 16, 1994.  The Court finds from the proof, and has to infer from the proof, that subsequent to 1994, there were discussions regarding payment of this invoice and/or nonpayment, but more importantly, the Court accepts the testimony of the plaintiff that there were promises to pay.
>
> I make that decision based on three factors.  One, the lawsuit against the defendant was not filed until August of 2000, which the Court infers from that that the plaintiff did make some efforts to work with the defendant about getting paid.
>
> Two, I'm disturbed about the defendant, when I received Exhibit 8, the defendant's credibility on his claim that there never were any discussions much after the August 16, '94 invoice.[6]
>
> \*                                  \*                                  \*
>
> ...I believe the lawsuit was filed within the applicable statute of limitations, which I find to be six years.  According to the plaintiff, it was, approximately, almost three years worth of promises to pay before they realized the defendant was not going to pay and they instituted a lawsuit in 2000.  So I'll find that the statute of limitations does not bar the action.

From our reading of the entire record in this case, we find that the question of when FHI had notice of Flash's intention not to pay is a matter of Plaintiff's story versus Defendant's story. The issue, therefore, comes down to credibility of the witnesses.  Because the trier of fact is in a better position than this Court to determine the candor of these witnesses, we must defer to the trial court's finding absent abuse of discretion.  Because we find no abuse of discretion in the trial court's favoring Plaintiff's evidence, we affirm the finding of the trial court that this suit was timely filed.

---

[6] As noted *supra*, Exhibit 8 is a letter from Flash's attorney to FHI's attorney.  The purpose of the letter is to dispute Flash's liability under the Agreement.

### The trial court erred in allowing inadmissible
### hearsay evidence to toll the running of the
### statute of limitations

Flash asserts that the trial court erred in allowing Mr. Bailey to testify about Flash's alleged agreement to pay FHI's invoice, despite the fact that Mr. Bailey allegedly had no personal knowledge of any such promise. The specific testimony in question is as follows:

> Q. In fact, after you [FHI] sent the invoice and didn't get it for awhile, did somebody on behalf of FHI contact them and ask them to pay it?
>
> A. Yes, sir.
>
> Q. Did they pay it?
>
> A. No, sir.
>
> Q. Did they promise to pay it?
>
> A. Yes, sir.
>
> Q. Eventually–
>
> MR. THORP [attorney for Flash]: I'll object unless he can testify to who wit [sic]. Did he hear a conversation? Otherwise, it's hearsay.
>
> MR. BAYDOUN [attorney for FHI]: He's welcome to cross-examine, your Honor.
>
> THE COURT: I'm going to overrule the objection at this point. Go ahead.

We note that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439 (Tenn. 1992); *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995).

Flash asserts that the trial court's decision concerning the statute of limitations "could only have been based upon the hearsay testimony cited above." We disagree. Even if we concede that the trial court erred in allowing Mr. Bailey to testify about something outside his

personal knowledge, we note that Mr. Bailey's testimony was not dispositive on the issue of the running of the statute of limitations.

The trial court clearly found that there was a valid contract and that Flash did not repudiate that contract immediately upon signing it. We agree with those findings (see discussion *supra* under Issue 1). The Agreement, as printed in its entirety above, clearly obligates Flash to pay FHI for the clean-up. Furthermore, the Agreement contemplates a ten day grace period from the date of the invoice in which no penalty will be charged for non-payment. There is no indication in the Agreement that failure to pay immediately upon receipt of the invoice, or for at least ten days thereafter, is evidence of a repudiation, absent written or verbal communication from Flash to FHI that they did not intend to pay. Although Flash's witness, Mr. Patterson, testified that he contacted FHI upon receipt of the invoice to say that Flash would not pay, it is clear from the record that the trial court disputed the credibility of this witness. Since we find nothing in the record to indicate that the trial court's finding on credibility constituted an abuse of discretion, we cannot take Mr. Patterson's testimony as fact on this appeal.

What we are left with is the Agreement itself. As stated above, we find nothing in this Agreement to indicate that FHI knew or should have known that Flash would not pay the invoice upon receipt. And based upon the fact that the Agreement contemplates a grace period of ten days, we cannot say that FHI should have been charged with notice of repudiation until such time as that ten days had lapsed. Therefore, the earliest that the statute of limitations could have begun to run would have been ten days from the date of the invoice, which would have been August 26, 1994. The six-year statute of limitations would, therefore, have expired on August 26, 2000. This suit was filed on August 25, 2000, which was within the applicable statute.

### The trial court erred by not holding the lawsuit barred by laches.

Laches is an equitable doctrine that can be invoked when a party exercises unreasonable delay in pursuing ones rights. ***Nunley v. Nunley***, 925 S.W.2d 538, 542 (Tenn. Ct. App.1996) (citing ***Hannewald v. Fairfield Communities, Inc***., 651 S.W.2d 222, 228 (Tenn. Ct. App.1983); ***Parker v. Bethel Hotel Co.***, 34 S.W. 209, 217 ( Tenn. 1896)). Delay by itself is not sufficient to invoke the doctrine of laches. ***Id***. "[T]he determinative test as to laches, which may be available as a successful defense, is not the length of time that has elapsed, but whether, because of such lapse of time, the party relying on laches as a defense has been prejudiced by the delay." ***Id***. (quoting ***Brister v. Estate of Brubaker***, 336 S.W.2d 326, 332 (Tenn. 1960)). In cases where delay in filing suit can be explained or justified, the defense of laches will not be applied. ***Shell v. Law***, 935 S.W.2d 402 (Tenn. Ct. App.1996). Application of the doctrine of laches lies within the discretion of the trial court. ***John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.***, 715 S.W.2d 41 (Tenn.1986); ***Hardeman County Bank v. Stallings***, 917 S.W.2d 695 (Tenn. Ct. App.1995).

In the instant case, Flash claims that FHI's suit should have been dismissed on the basis of laches due to the fact that FHI delayed filing suit for more than six years after the Agreement

was signed by McMahan. Flash asserts that they were prejudiced by FHI's delay in that Flash would have sued Bob Taylor Trucking for negligently causing the spill had Flash been found liable to FHI for the clean up; however, because of FHI's delay, Flash is now barred by the statute of limitations from filing suit against Bob Taylor Trucking. After careful review of the record, we cannot agree with Flash's position. Any claims Flash had against Bob Taylor Trucking were independent of FHI's suit for breach of contract. At any time within the applicable statute of limitations, Flash could have sued Bob Taylor Trucking for negligence, regardless of any liability Flash might have had to FHI. Therefore, the trial court did not abuse its discretion in disallowing the defense of laches under the facts of this case.

**Whether the trial court abused its discretion by
failing to apply the applicable legal standard
for determining reasonable attorneys' fees.**

By Order dated March 8, 2002, the trial court awarded FHI $5,908, plus $2,000 in attorney's fees. On April 10, 2002, FHI filed a Motion to Alter or Amend, requesting additional attorney's fees. FHI's Motion was denied by Order entered May 9, 2002.

The Agreement between FHI and Flash provides that, "[i]n the event payment is not made and this Agreement is placed in the hands of an attorney for collection, Client agrees to pay all collection costs, including reasonable attorney fees." In support of FHI's claim for attorney's fees under the Agreement, Nader Baydoun, attorney for FHI, filed two Affidavits, along with the time sheets kept in connection with this case. Mr. Baydoun's Affidavit indicates that his hourly rate was $205. The time sheets show that FHI incurred $7,656.50 in attorney's fees and $334.99 in expenses for prosecuting this action for a total charge of $7,991.49. As noted above, the trial court awarded only $2,000 in attorney's fees. FHI now contests the reasonableness of the trial court's decision and claims, specifically, that the trial court lowered the amount of attorney's fees because the compensatory damage award was only $5,908. From our review of the record, and in particular the Orders dated March 8, 2002 and May 9, 2002, there is no indication that the trial court's award of $2,000 in attorney's fees was in any way based on the amount of compensatory damages. In fact, the trial makes no specific findings as to the factors which justify this amount in fees.

The following are the factors listed in D.R.2-106 S.Ct. Rule 8 concerning the determination of whether a fee is reasonable:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
> (3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

From the record before us, we conclude that the trial court did not use the proper standard in determining the award of attorney's fees and expenses in this case. In determining the amount of fees and expenses to award, the issue is not how the fees requested compare to the amounts eventually awarded to the plaintiffs; rather, the issue is how the requested fees and expense measure up under D.R. 2-106. Where the attorney's fee is based upon a contractual obligation expressly providing for reasonable attorney's fees, the award must be based upon the guidelines by which a reasonable fee is determined. *See Wilson Management Co. V. Star Distrib. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988); *see also United Med. Corp. Of Tennessee v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 136 (Tenn. 1986). We, therefore, remand this case to the trial court for a new determination of an attorney's fee award under D.R. 2-106 and the applicable case law.

For the foregoing reasons, we affirm the Order of the trial court to the extent that it awards FHI $5,908 in compensatory damages, exclusive of attorney's fees. We reverse the Order of the trial court on the issue of attorney's fees and remand the matter for a determination of reasonable attorney's fees consistent with this opinion. Costs of this appeal are assessed to Appellant, Flash Market, Inc., and its surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.