IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2010 Session

## FIRST PEOPLES BANK OF TENNESSEE v. JAMES L. HILL

**Appeal from the Chancery Court for Jefferson County**
**No. 07-039     Telford E. Forgety, Jr., Chancellor**

---

**No. E2009-02067-COA-R3-CV - FILED MAY 26, 2010**

---

James L. Hill ("the defendant"), in order to accommodate his son, Shannon Hill, co-signed a note to First Peoples Bank of Tennessee ("the Bank") in the amount of $50,500 ("the small note"). Shannon[1] later approached the Bank about a larger loan for his pizza business. As a consequence, the small note was combined with two other notes. The Bank made a loan in the amount of $294,764.65 under a new note ("the big note") but required a personal guaranty from the defendant as security. Unbeknownst to the Bank, the guaranty Shannon produced was a forgery. Shannon was later killed and, still later, his pizza business defaulted on the big note. The Bank initially filed this action against the defendant on the sole basis of the guaranty. The Bank later amended its complaint to allege that the big note was a renewal of the small note and that the defendant remained liable on the small note. The primary issue for trial was whether the small note was renewed or whether it was satisfied with the proceeds from the big note. On the morning of trial, when the Bank's witnesses appeared, the chancellor announced that he was acquainted with several of the Bank's witnesses. The defendant made an oral motion seeking recusal of the chancellor. The court denied the motion and the case proceeded to a bench trial. After trial, the court entered a judgment in favor of the Bank which included the attorney's fees of the Bank. The defendant appeals. The Bank asks for its attorney's fees incurred on appeal. We affirm that part of the judgment which awards principal and interest, but vacate the award of attorney's fees claimed in the amount of $25,125 and remand for a determination of a reasonable fee. Additionally, we hold that the Bank is entitled, under the note, to recover reasonable attorney's fees incurred on appeal and remand for a determination of a reasonable appellate fee.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Vacated in Part; Case Remanded**

---

[1]The son's first name is used to differentiate him from his father. No disrespect or familiarty is intended by the use of the first name.

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Paul Whetstone, Morristown, Tennessee, for the appellant, James L. Hill.

Tom O. Wall, Jefferson City, Tennessee, for the appellee, First Peoples Bank of Tennessee.

**OPINION**

I.

The best way to establish a context for the reader is by reference to the key trial exhibits. The small note is exhibit 5. The loan date is February 25, 2005, and the loan number is 800181001. It is payable to the Bank as lender. It is in the original principal amount of $50,500.[2] It is endorsed by Shannon Hill and the defendant as "borrowers." The small note contains the following "General Provisions":

> . . . Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change . . . the time for payment or other terms of any indebtedness . . . ; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as a maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length

---

[2]The defendant vehemently asserts that he only agreed to sign a note in the principal amount of $50,000, but his counsel concedes in his brief that, although this is a matter of "great consternation" to his client, it is not an issue on appeal. In our view, since exhibit 5, the small note, was filed by stipulation and admittedly bears the defendant's signature, that is the end of any issue as to the original amount of the small note.

of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. . . .

The note contains a provision allowing the Bank to recover costs of collection, including, "subject to any limits under applicable law, Lender's attorney[']s fees and Lender's legal expenses." In capital letters, the small note bears the word "RENEWED" stamped on its face with a date of March 29, 2006. The stamp contains a reference to note 200112601.

The big note is trial exhibit 7. It is dated March 29, 2006, and numbered as 200112601. The Bank is the lender and the borrower is "Pizza Inn, Jefferson City Partnership" ("the Partnership"). It is signed for the Partnership by the general partners, one of whom was Shannon. The principal amount of the big note is $294,764.65. Exhibit 24 is a "Disbursement Request and Authorization" for the proceeds of the big note, which shows a payment of $50,500 on the small note. However, exhibit 24 refers to the transaction as a "secured renewal" of notes, including the small note. Exhibit 6 is the Bank's ledger sheet for loan number 800181001, the small note, which reflects a payment of $50,500 with a resulting balance of "0." Exhibit 15 purports to be the "Commercial Guaranty" for guarantor James L. Hill. However, "his" signature on the document was determined to be a forgery. The guaranty with the forged signature of defendant, by its terms, limits his guaranty on the big note to $50,500.

As previously stated, the big note was not paid, and the Bank filed this action against the defendant seeking to recover on the guaranty. The Bank demanded a recovery of the principal amount of the big note, plus interest, costs and attorney's fees. In an amended complaint filed just eight days after the original complaint, the Bank included an allegation that the big note was a renewal of the small note. As previously noted, renewals are authorized by the terms of the small note.

The defendant filed an affidavit and sworn denial stating that the signature on the guaranty was a forgery. The defendant followed up with a motion for summary judgment arguing that he was not liable on the guaranty because it was a forgery and that he was not liable on the small note because it was paid in full and discharged by the proceeds from the big note. The court granted partial summary judgment absolving the defendant of liability on the guaranty. The defendant filed a "renewed" motion for summary judgment in which he made essentially the same arguments he makes on appeal. The trial court denied the

renewed motion and the case proceeded to trial on the Bank's theory that the defendant was liable on the small note.

When the case was called for trial, the rule of sequestration was called for, and several of the Bank's witnesses were identified by name. At this point, the chancellor immediately made the following comments:

> . . . I'm not sure whether I've mentioned this to you before, but I know everybody, basically, at First Peoples Bank. Now, I don't do my banking at First Peoples Bank, but I'm in Rotary Club, for example, with Daryle Keck. My children played soccer . . . years ago, on the same soccer team with some of his children. . . . I know Mr. Byard. . . . Of course, I know most of the people at most of the banks in Jefferson County. That does not, in my opinion, I have no reason to recuse myself in this case, but I do want to tell you those things beforehand. Of course, like I say, it wouldn't make any difference if you sued Citizens Bank, or you sued First Peoples Bank, or you sued BB&T, I'd know some or most of them at any bank in the county.

The defendant then made an oral motion for the chancellor to recuse himself. The chancellor again declined to step aside, at which point the defendant asked to be allowed to voir dire the Bank's witnesses concerning their relationship with the chancellor. The court allowed the defendant, through counsel, to voir dire Daryle Keck, Clyde Byard, Barbara Trent and Mike Johns, all employees of the Bank.

Mr. Keck characterized the chancellor as a "friend" but admitted on cross-examination he had never visited in the chancellor's home and vice versa. They do not socialize in any manner. Mr. Byard testified that the chancellor's old law firm had done work for a bank which previously employed Mr. Byard, but most, if not all, of the work was done by a lawyer other than the chancellor. Neither Barbara Trent nor Mike Johns was personally acquainted with the chancellor. At the end of voir dire, the defendant renewed his motion and the court again denied it.

The Bank called Clyde Byard as its first witness. Mr. Byard testified that Shannon approached him about combining the small note and two others into one note. The Bank agreed but specified that it would need to maintain all the collateral and all the "signers" it had on the original notes. The loan was made under the big note with the lender shown as "Pizza Inn, Jefferson City Partnership." The Bank required guaranties from Shannon, his

partner, their wives, and the defendant. Byard allowed Shannon to take the unsigned guaranty out of the Bank. What the Bank did not know is that Shannon forged his father's signature on the document he returned to the Bank.

When the big note was made, the small note was overdue. It was the Bank's intention, according to Mr. Byard, to renew the small note as part of the big note, rather than cancelling it or releasing it. Byard testified that the Bank relied on the terms of the small note in making the renewal. Byard stated that the amount due on the small note, including accrued interest, was $60,944.16 plus attorney fees of $25,125. The latter figure came from two statements of the Bank's attorney; the parties stipulated that the bills could come into evidence without further authentication.

On cross-examination, Mr. Byard admitted he had never met the defendant. He said that he regretted not having the defendant appear personally at the Bank to sign the guaranty. Mr. Byard also admitted that he did not consider whether public policy or case law required the Bank to handle the "renewal" differently. Mr. Byard was cross-examined aggressively concerning the ledger entry showing a balance due of "0" on the small note after payment of $50,500 from the proceeds of the big note. Mr. Byard agreed that if the original loan – the small note – had been made with another bank, and then paid off with the proceeds of a big note made with the Bank, the original loan would have been paid and discharged. The difference, according to Byard, is that, with the involvement of another bank, there is "new money" exchanged. In the transaction at issue in this case, there was no "new money"; only a ledger entry[3] reflecting a payment. The transaction was handled this way to keep the Bank from carrying the $50,500 loan as an asset in two places. In reality, no payment was made. Mr. Byard was also cross-examined with respect to a written loan policy that states: "Extensions are actually a revision of the terms of the note and could indicate a problem with existing loans." Such an extension or revision would require the same approval as an original loan. It is undisputed that there was a loan application for the big note.

Barbara Trent, loan operations officer for the Bank, was the next witness. She testified that when a note is paid, it is marked "paid in full" and mailed to the customer. On the other hand, if a loan is renewed, the note is stamped "renewed" and kept in the loan department. Typically, if a note is paid with a check from a customer, it will be marked

---

[3]The defendant invites us to scrutinize a statement of the court to the effect that if "you're a bank" you can "have your cake and eat it too." The defendant does not articulate why or how the court's observation should be scrutinized. We are not interested in innuendo and word games. We are interested in whether the trial court committed reversible error as demonstrated in the defendant's brief. Read in context, the chancellor's remark appears to be a comment on the state of the law applicable to bank notes rather than something sinister.

"paid" but if it is paid by another loan that is "booked" with the Bank, it will be marked as "renewed."

Daryle Keck, president and CEO of the Bank, characterized the practice of marking notes that have been paid by successor notes as "renewed" as "standard banking practice." He admitted on cross-examination that the big note represents a change in the terms of the small note.

Joe Ann Hill, the defendant's wife of many years, admitted that the small note bears the defendant's authentic signature. However, she testified that her husband can neither read nor write. She could have read the document to her husband but did not. She, however, could not understand the above-quoted "General Provisions" paragraph.

The defendant testified that he is 73 years of age and has not learned to read or write but he understands numbers. He acknowledged that the signature on the small note is his signature but testified that, in his opinion, the document had been altered to show a principal amount of $50,500 instead of $50,000.[4] In his opinion, the Bank should have read the language in the general provisions to him. The defendant further stated his belief that the small note was paid and discharged with the proceeds from the big note. On cross-examination, the defendant admitted that he had been in the real estate business for about 40 years and had lots of dealings with banks and notes. The defendant stopped short of admitting that he had become a multi-millionaire in the real estate business, which necessarily involved dealing with banks and notes, but did admit that it had been profitable for him and that he had "done pretty good."

Several rebuttal witness were called to address the issue of whether the Bank altered the small note. The substance of their testimony is that the amount of money advanced was $50,000 but there was a $500 fee associated with the loan that immediately raised the principal amount due to $50,500.

The proof regarding the attorney's fees of the Bank is in the form of two itemized statements, submitted as collective exhibit 26, that total $25,125. The exhibits were admitted by stipulation. The Bank's attorney did not submit an affidavit regarding his fees, nor did he testify at trial. The defendant did not put on any proof that the fees claimed were unreasonable or excessive. The defendant did, however, testify that he paid his attorney a $5,000 flat fee to handle the matter and that he would not have hired an attorney that quoted a $25,000 fee. He admitted on cross-examination that he would have willingly paid the

---

[4]See footnote 2.

$5,000, regardless of the time expended, *e.g.*, if his lawyer had been able to get the case dismissed through minimal effort such as a phone call.

After hearing closing argument, the court announced its opinion that "the bank is entitled to a judgment against Mr. James Hill for the amount of the principal balance of the loan, plus accrued interest, plus attorney's fees, a total of [$86,069.16]." The court went on to explain its reasoning as to liability as follows:

> Bottom line is, it has been the law for a hundred years at least, and maybe more than that, in Tennessee that the execution of a renewal note does not mean that the old note is discharged or considered paid, and it may not be discharged and considered paid even if it is in fact marked discharged and surrendered over to the original maker of the note. That's what happened in ***First National Bank of Sparta v. Yowell***[, 294 S.W. 1101 (Tenn. 1927)].

The court found the evidence was overwhelming that the big note was a renewal rather than a discharge; the court further found that such was the intent of the Bank. The court complemented defense counsel on his argument concerning the disbursement sheet and ledger sheet, but again found it clear that the entries on those documents were "for accounting purposes" to keep from having the same asset on the Bank's books twice. The court entered a judgment against the defendant and in favor of the Bank in the amount of $86,069.16. The judgment incorporates the court's memorandum opinion. The defendant filed this timely appeal.

II.

The issues as quoted verbatim from the defendant's brief are:

> Whether the Chancellor should have entered an order recusing himself from presiding over the case.

> Whether Tennessee's adoption and judicial interpretation of the Uniform Commercial Code should, as a matter of law, have compelled a Judgment for the [defendant].

> Assuming, arguendo, that the Chancery judgment is affirmed on appeal, whether the attorney fees awarded were excessive and unreasonable under the circumstances.

The Bank has filed a motion asking that, pursuant to its rights under the small note, it be awarded its attorney's fees incurred on appeal. As we address these issues, we will identify the standard by which we are reviewing each.

III.

A.

The first issue for our attention is whether the chancellor should have recused himself. A trial judge's decision "whether recusal is warranted [is] addressed to the judge's discretion, [and] will not be reversed on appeal unless a clear abuse appears on the face of the record." ***Davis v. Liberty Mut. Ins. Co.***, 38 S.W.3d 560, 564 (Tenn. 2001). The defendant refers us to ***Caperton v. A.T. Massey Coal Co.***, 129 S.Ct. 2252, 2259 (2009), for the proposition that the right to a fair trial is a matter of due process. The Tennessee Supreme Court has recognized that litigants are entitled to the "cold neutrality of an impartial court" and that "a trial before a biased or prejudiced fact finder is a denial of due process." ***Davis***, 38 S.W.3d at 564. Thus, ***Caperton*** adds nothing to the body of Tennessee law relative to recusal. The defendant also quotes ***Caperton*** for the proposition that the judge should look beyond whether he or she is actually, subjectively biased and ask whether an average judge in his or her position would have an impermissible "potential for bias." Again, ***Caperton*** adds nothing to Tennessee law – well-established Tennessee law recognizes "recusal is also appropriate 'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.' " ***Davis***, 38 S.W.3d at 364 (*quoting **Alley v. State***, 882 S.W.2d 810, 820 (Tenn. Crim . App. 1994)). Thus, we will conduct our review under the familiar language of our own cases.

B.

The defendant suggests that "the end result [*i.e.*, judgment for the Bank] was of no surprise to anyone." The defendant's suggestion is unwarranted because there has been no showing of bias on the part of the chancellor. There is nothing in the record to indicate that the chancellor had an opinion as to the merits before hearing the evidence, nothing in the record suggesting that the court had a pre-formed position favorable or unfavorable to one party or the other, and no remarks suggesting that the chancellor had prejudged the factual issues. *See **Davis***, 38 S.W.3d at 565 n.2. The "worst" that can be said is that the chancellor had some knowledge of the law concerning renewal notes.

C.

The only possible ground for recusal here is that the appearance of bias from the chancellor's acquaintance with some of the bank officers might cause another judge of "ordinary prudence" to question his own impartiality. The defendant attempts to make much of the fact that the chancellor made the disclosure on the morning of the trial; however, the Bank asserts that the Bank's representatives were not present at pretrial hearings and, therefore, the chancellor could not have known about them before the morning of trial. We have found nothing in the record to show one way or another whether the chancellor knew or could have known who the Bank would call as witnesses at trial. We note that the defendant took the depositions of Bank witnesses and explored a possible connection with the chancellor in the deposition of Mr. Byard. Given the advance knowledge the defendant had from Mr. Byard's deposition, we are convinced that, at best, the defendant overstates the significance of the timing of the chancellor's disclosure.

D.

The defendant has produced no authority for its argument that a mere acquaintance between a judge and a witness is ground for recusal. We believe it is beyond question that the standard the defendant seeks to impose is too strict. The legal community and the public at large must accept that a judge comes to each case with a past and not every connection between the case at bar and the judge's past can be inflated into a reasonable "potential for bias." For example, in *Davis*, the plaintiff attempted to force recusal of the chancellor because he, the chancellor, had made observations in an earlier case that raised serious questions about the professionalism of the plaintiff's expert witness. 38 S.W.3d at 563-64. The plaintiff in *Davis* argued that using the objective approach with reference to the history between the chancellor and the witness, the chancellor's impartiality "might reasonably be questioned." *Id.* (*quoting* Tenn. Sup. Ct. R. 10 (Canon 3(E)(1)). The Supreme Court observed that the adversarial nature of the system within which judges must work does not allow questioning a judge's impartiality simply because the judge has previously found a witness not to be credible. *Id*. at 565. Despite the history between the chancellor and the expert, the Court held that "it cannot reasonably be questioned that the trial judge was able to render an impartial decision and preside over the case in a neutral and unbiased manner." *Id*. In *Kinard v. Kinard*, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998), the wife in a divorce case argued that the judge's previous office-sharing arrangement with the husband's attorney required recusal. The *Kinard* Court noted that a past professional relationship between the judge and one of the lawyers in the case is not, without more, grounds for recusal. After considering the "totality of the circumstances," the court found that a "reasonable person, knowing all the relevant facts, would not conclude that the trial judge could not be

-9-

impartial." *Id*. at 229. The former professional association did not even "provide a reasonable basis for questioning the trial judge's impartiality." *Id.* at 227.

E.

The same conclusion must be drawn in the present case. The chancellor does not do his banking at the Bank. He has no personal or social relationship with the Bank's representatives. He stands to gain nothing from the Bank winning the case. We find absolutely no basis for concluding that the chancellor's relationships with certain employees of the Bank, limited as they were, created an appearance of bias on his part. Therefore, we hold that the chancellor did not abuse his discretion in declining to recuse himself from hearing this case.

IV.

A.

We now consider whether the trial court erred in finding the defendant liable to the Bank. We review the factual findings made after a bench trial *de novo* with a presumption that the findings are correct unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). The court's conclusions of law are reviewed *de novo* with no presumption of correctness. *Id.*

B.

The defendant argues that the judgment of the trial court ignores Tenn. Code Ann. § 47-3-401(Supp. 2009) and *Cumberland Bank v. G & S Implement Co.*, 211 S.W.3d 223 (Tenn. Ct. App. 2006). The former is part of Tennessee's codification of the Uniform Commercial Code. It states, in pertinent part, that "[a] person is not liable on an instrument unless . . . he signed the instrument . . ." This statute works well enough with regard to the commercial guaranty upon which the defendant's signature was forged. In fact, the statute facilitated the securing by the defendant of partial summary judgment absolving him of liability on the commercial guaranty of the big note. However, the defendant's reliance on the statute ignores the fact that he signed the small note, thereby assenting to the provisions that agreed in advance to extensions, modifications and renewals. It was the small note upon which he was held liable.

The defendant's reliance upon *Cumberland Bank* is likewise misplaced. In that case, the defendant Dickerson had signed a note made in 1996 as an accommodation maker for the primary debtor, Kingrey. 211 S.W.3d at 230. Kingrey went into chapter 11 bankruptcy and

his plan of reorganization, approved by court order, required him to dispose of the 1996 note and secure a new note, which he did in 2000. This court took an especially close look at the factual background, and observed as follows:

> [T]he bankruptcy court's March 1999 order provides clear evidence regarding the purpose and effect of the Kingreys' 2000 note. This order undermines the bank's claims in this case.
>
> The bankruptcy court's order required the Kingreys to "obtain [] refinancing" within nineteen months to pay the unpaid balance of the 1996 note "in full." In the context of bankruptcy proceedings, the word "refinancing" is a term of art. It connotes a transaction that substitutes one debt for another. Accordingly, the Kingreys could not comply with the bankruptcy court's order by simply renewing the existing note. The bankruptcy court envisioned that they would replace this existing debt with a new one.
>
> The significance of the choice of the term "refinancing" is buttressed by other language in the bankruptcy court's order. The order required the Kingreys to pay off the entire secured balance of their debt to the bank "in full" on or before the nineteenth month following the confirmation of their reorganization plan. Therefore, both the Kingreys and the bank were required to pay off this debt in full by October 2000. Replacing the 1996 note with an entirely new note in 2000 would comply with the bankruptcy court's order because it would have the effect of paying off the 1996 note in full.
>
> The 2000 note reflects the Kingreys' and the banks' compliance with the bankruptcy court's order. The order would not have permitted the Kingreys and the bank to simply renew or "reaffirm" the 1996 note. It required the 1996 note to be refinanced and paid in full. The Kingreys obtained the "refinancing" ordered by the court, and this refinancing was used by the bank to pay the outstanding balance of the 1996 note "in full." Any other interpretation of the 2000 transaction between the bank and the Kingreys would require us to find that the Kingreys and the bank failed to comply with the bankruptcy court's order. We decline to make such a finding because we

-11-

presume that parties such as the Kingreys and the bank would never knowingly fail to comply with a valid court order.

In light of our decision that the Kingreys' 2000 note is a new indebtedness that paid off the 1996 note in full, no conclusion can be drawn other than Mr. Dickerson is no longer liable to the bank under the 1996 note. As a maker, he has been discharged because the note has been paid in full.

*Cumberland Bank*, 211 S.W.3d at 231 (citations omitted).

It is apparent that the outcome in *Cumberland Bank* turned on the unique facts which demonstrated the intent of all concerned that the 2000 note was to discharge the 1996 note. The present case demonstrates just the opposite as the trial court observed in its memorandum opinion.

> [T]he evidence could not be more overwhelming in the Court's opinion that the bank by no means . . . meant for that fifty thousand dollar note when the renewal note, the big note . . . was made . . . for the fifty thousand, five hundred dollar note to be considered paid or discharged. Everything in the record points exactly to the opposite conclusion. Number one, it's the policy of the bank . . . that when a note is paid – paid, they mark it paid, and they give the original note back to the customer, so they don't have it any more. When a note is renewed, they hold on to the old note, they mark it renewed, and they do not render it over to the customer, and that is exactly what happened here. . . . The note was marked renewed, it was retained to the bank. . . . The Court also notes that the disbursement sheet . . . for the big note, that's exhibit 24, . . . specifically refers in two different places to the fact that the little note, the fifty thousand dollar note, is renewed. Now, the Court notes that on the disbursement sheet, and [counsel for the defendant did] a good job . . . of saying: Look, Judge, it says on that disbursement sheet that fifty thousand dollars is disbursed toward payment of that earlier note . . . . But it's clear to me that all that was going on there was for purposes of correct accounting from the bank's point of view, you had to show one or the other [of] those notes at zero, otherwise you're doubling up on the same asset. . . . .

-12-

* * *

The public policy of the state of Tennessee on this particular point is that the renewal of a note does not discharge the old note unless all the parties to the old note agree that that is what is intended, and they certainly here do not agree, the parties do not agree. Indeed, the Court would make this observation, . . . incidentally, I'm back to that commercial guaranty, it's clear to me the bank wanted to keep Mr. James Hill liable for fifty thousand, five hundred dollars. . . . So, the fact that they meant for him to sign the new note and to have a guaranty for fifty thousand, five hundred dollars tells me absolutely that they meant for that fifty thousand dollar liability of Mr. Hill to the bank to continue in effect. Let's take a look at what was Mr. Hill's intention with respect to the new note. . . . He didn't even know about it, so how . . . could it even have been his intention that the new note take the place of the old one because he didn't even know about it at the time it was made. . . .

The only thing we would add to the trial court's observations regarding the facts is to note that the defendant acknowledged, in signing the small note, that the Bank had complete freedom to renew or modify that instrument, to apply payments in such manner as it saw fit, and to take any subsequent action, without worrying that it would result in a discharge of liability. Accordingly, we readily conclude that the evidence does not preponderate against the trial court's factual findings.

V.

A.

In our *de novo* review we also conclude that the trial court did not err in its legal analysis. The law as stated in **Commerce Union Bank v. Burger-In-A-Pouch**, 657 S.W.2d 88 (Tenn. 1983), is clear that it is the intention of the parties that controls whether an existing note is paid or renewed by a successor note:

> The law in Tennessee, long and well-settled, is that a renewal note does not discharge the original note unless all of the parties thereto agree that the renewal is to have this effect. **First National Bank of Sparta v. Yowell**, 155 Tenn. 430, 294 S.W.

-13-

1101 (1926); *First National Bank of Sparta v. Hunter*, 22 Tenn.App. 626, 125 S.W.2d 183 (1938).

> In *Yowell*, Yowell owed the bank on a note. He renewed the note and the old note was marked paid and surrendered. The renewed note incorporated an increased rate of interest, a material alteration made upon the representation of an endorser on the note who arranged for its renewal. Although the bank was refused recovery on the materially altered note, this being in accordance with a provision of the uniform negotiable instrument law, it was allowed recovery on the original note, the holding being that the original note was not affected by the renewal note.

*Id.* at 90. This is the law the trial court followed in making its finding that the defendant remained liable under the small note. There is no erroneous finding of fact or conclusion of law by the trial court.

B.

The defendant argues that the small note was merged into the big note under general principles of contract law. Such general principles are ineffective against the "General Provisions" paragraph in the small note and the specific body of "well-settled" law applicable to renewal notes. The defendant argues that the Bank should be estopped by its own "gross-negligence" in accepting his forged signature on his guaranty. We cannot fathom how this theory of estoppel would work – the defendant cannot possibly show any reliance or change in position based on any act of the Bank.

VI.

The final issue we address is attorney's fees. There is no doubt that, under the terms of the small note, the Bank is entitled to recover an attorney's fee for work done with respect to proceedings before the trial court and on appeal. The recognition in the note that the fees are "subject to any limits under applicable law," is well advised and we believe in accord with the ethical requirement that fees be "reasonable." Sup. Ct. R. 8, RPC 1.5(a)("A lawyer's fee and charges for expenses shall be reasonable."). The Bank asks us by motion to award fees for its work on this appeal in the amount of $9,571.47. Alternatively, the Bank asks us to determine that it is entitled to a fee and remand to the trial court for a determination of the amount. This is the approach that is preferred, if not required. *Folk v.*

*Folk*, 357 S.W.2d 828, 828 (Tenn. 1962). Accordingly, we grant the Bank's motion and hold that the Bank is entitled to recover reasonable attorney's fees incurred on appeal, but remand to the trial court for a determination of an amount that is reasonable.

As to the fees awarded by the trial court, the defendant correctly points out that the trial court did not in its memorandum opinion or judgment directly address either the amount of the fees or their reasonableness. The trial court did announce in the memorandum opinion that it was awarding the bank "the principal balance of the loan, plus accrued interest, plus attorney's fees, a total of [$86,069.16]." We know the amount awarded for attorney's fees only by subtracting the principal and interest from the total amount of the judgment.

Normally, this court will afford the trial judge who has handled the pre-trial proceedings and presided over the trial considerable discretion in determining a reasonable attorney's fee. ***Jerry T. Beech Concrete Contractor, Inc. v. Larry Powell Builders, Inc.***, No M2001-02709-COA-R3-CV, 2003 WL 726955 at *3 (Tenn. Ct. App. M.S., filed March 4, 2003). When the trial court has exercised its discretion in light of the appropriate factors and found the fee to be reasonable, we simply review for abuse of discretion. ***Id***. Where, however, there is no finding that the fee is reasonable, and no way to ascertain whether the court made the award in light of the appropriate factors, there is no way for us to accord the normal deference to the trial court.

In the case of a contract that provides for attorney's fees in the event of default, the amount of the fee must be reasonable, even if the contract does not so require. *See **Beech Concrete***, 2003 WL 726955 at *1. In ***Beech Concrete***, the contract at issue provided a right to fees but did not state that fees must be reasonable. ***Id***. Nevertheless, this court required that the trial court determine "a reasonable fee in accordance with ***Connors v. Connors***, 594 S.W.2d 672 (Tenn. 1980) . . . and Disciplinary Rule 2-106 of the Code of Professional Responsibility, Rule 8 of the Rules of the Supreme Court." ***Id.*** Where a trial court awards a fee, but there is nothing in the record to indicate that the trial court actually evaluated the amount of the fee to see if it is reasonable in light of the appropriate factors, the correct approach is to vacate the award and "remand [the] case to the trial court for a new determination of an attorney's fee award under [Supreme Court Rule 8, RPC 1.8] and the applicable case law." ***Ferguson Harbour Inc. v. Flash Market, Inc***., 124 S.W.3d 541, 553 (Tenn. Ct. App. 2003). That is exactly the situation before us. Accordingly, we will vacate the award of attorney's fees and, rather than try to make a determination in the first instance, remand to the trial court for determination of a reasonable fee. We express no opinion as to whether the fees sought by the Bank for the trial or appeal work are reasonable or not.

## VII.

The judgment of the trial court is affirmed as to its award to the Bank of principal and interest in the amount of $60,944.16, but vacated as to its award of attorney's fees of $25,125. Costs on appeal are taxed to the appellant, James L. Hill. This case is remanded to the trial court, pursuant to applicable law, for such other proceedings as are necessary and consistent with this opinion including, specifically, determination of a reasonable attorney's fee, both at trial and on appeal.

_____
CHARLES D. SUSANO, JR., JUDGE