
# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### February 14, 2017 Session



## SOUTHWIND RESIDENTIAL PROPERTIES ASSOCIATION, INC. v. KELVIN FORD

### Appeal from the Circuit Court for Shelby County
### No. CT-003095-13  Jerry Stokes, Judge

_____

### No. W2016-01169-COA-R3-CV

_____

The association obtained a favorable judgment for unpaid assessments against property owner of 1.6 lots as well as attorney's fees in the trial court. Property owner appeals. We vacate the trial court's attorney's fee award in favor of the association and remand for consideration of the reasonableness factors as outlined in the Tennessee Rules of Professional Responsibility. We affirm the trial court's judgment in all other respects. Affirmed in part, vacated in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which D. Michael Swiney, C.J., and ARNOLD B. GOLDIN, J., joined.

Joshua B. Bradley, Memphis, Tennessee, for the appellant, Kelvin Ford.

Peter D. Baskind, Robin H. Rasmussen, Memphis, Tennessee, for the appellee, Southwind Residential Properties Association, Inc.

## OPINION

### BACKGROUND

Defendant/Appellant Kelvin Ford ("Mr. Ford") and his wife Tasha Ford ("Dr. Ford" and together with Mr. Ford, "the Fords") purchased a piece of property by special warranty deed on July 30, 2010. The property is located in a portion of the Southwind Planned Development known as "The Estates." The subdivision plat for The Estates was

filed on May 6, 1991 and reflects twelve large lots. According to the special warranty deed, the property purchased by the Fords consists of "Lot 1 and part of Lot 2, Phase XXVII, . . . as recorded in Plat Book 134, Page 39, in the Register's Office of Shelby County, Tennessee." Of the twelve original lots in the recorded subdivision plat, only Lots 1–4 survive to this day; Lots 5–12 were subdivided into smaller plots, referred to as Lots 1–26 of Phase XL, and recorded in the plat book.

All of the property in the subdivision is subject to the Declaration of Protective Covenants, Agreements, Easements, Charges and Liens for Southwind (Residential), referred to as the "CCRs" by the parties. Under a 1995 amendment to the CCRs ("1995 Amendment" or "Amended CCRs"), the properties in the subdivision are subject to the "Assessment of Annual Charge," which is to be determined by the Board of Directors ("the Board") of the Plaintiff/Appellee Southwind Residential Properties Association, Inc. ("the Association").[1] The assessment is to be calculated taking into account the "Lot Share" of each parcel, as discussed in detail, *infra*. The CCRs do not specifically address parcels that include partial lots. In addition to rules regarding the Annual Assessment, the CCRs provide rules regarding the maintenance of property. Specifically, Section 1.01 of Article X of the CCRs provides that: "Each owner shall keep all or thereon, in good order and repair, including the seeding, watering, and mowing of all lawns [and] the pruning and cutting of all trees and shrubbery[.]" Additionally, the Association Bylaws, adopted in 2009, specifically provide that: "The membership rights of any Member, including the right to vote, may be suspended by the [Association] for any period during which any assessment or charge owed to the Association by any such Member remains unpaid."

The dispute in this case largely stems from the assessment charged for the Fords' property. According to the Fords, the Association initially charged them for two full Lot Shares, despite the fact that he only owned one lot, plus a partial lot. Mr. Ford paid the full assessment for two years, but in 2012 brought the issue to the Association's attention. After 2012, the Association agreed to reduce the assessment to reflect a 1.6 Lot Share, taking into account the Fords' full ownership of Lot 1 and partial ownership of Lot 2; the Fords contended, however, that they properly owed only a single Lot Share. The Fords

---

[1] The Fords' deed contains a specific reference to the CCRs, including a notation that the CCRs were "further amended at FC 0899." The 1995 Amendment at issue, however, is contained at "Instrument No. FC 0889 in the Office of the Shelby County Register." In his brief, Mr. Ford does not argue that the 1995 Amendment to the CCRs does not apply to his property because it was not included on his deed, but that the 1995 Amendment is ambiguous. *See* Appellant's Brief, at 11 ("The Amendment, however, does not address partial lots or contiguous lot ownership, and is therefore ambiguous as it pertains to Mr. Ford's property, which consists of 'Lot 1 and Part of Lot 2.' . . . For this reason (despite the absence of reference to the Amendment in Mr. Ford's Deed, the CCRs, as amended at FC 0889), cannot be relied upon by the Association in its assertion that Mr. Ford knew or should have known how the Association would bill him for his property.") (internal citations omitted). Accordingly, we assume for purposes of this appeal that the 1995 Amendment is properly applied to Mr. Ford's property.

then unilaterally chose to remit only the assessment for a single Lot Share to the Association.

The Association thereafter filed a general sessions civil warrant against the Fords on March 25, 2013. The civil warrant requested $2,847.74 in unpaid assessments, as well as costs and attorney's fees for a total judgment of $25,000.00. The Association was initially awarded a default judgment; however, the default judgment was set aside and a trial was held. On June 26, 2013, the general sessions court awarded a judgment in favor of the Association in the amount of $3,368.39, "plus costs." Mr. Ford filed an appeal to circuit court on July 3, 2013. Although no notice of appeal was signed in the name of Dr. Ford, when the case was docketed in Division III of the Shelby County Circuit Court, both Mr. Ford and Dr. Ford were named as defendants.

The parties subsequently entered into a period of discovery. On October 28, 2013, the Association filed a petition for civil contempt against both Mr. Ford and Dr. Ford for their failure to appear at scheduled depositions. The Fords filed a response to the contempt petition on January 17, 2014, contending that they were in the process of obtaining new counsel at the time the deposition was scheduled. The parties thereafter agreed to strike the contempt petition and to reschedule the depositions.

On March 27, 2014, the Association filed an amended complaint. Therein, the Association more specifically outlined its claim for unpaid assessments, noting that it sought both a full assessment for Lot 1 and "at least sixty percent of a yearly assessment for Lot 2," reflecting the portion of Lot 2 owned by the Fords. The Association therefore sought a judgment for the full amount of unpaid assessments due at the time of trial, as well as pre-judgment interest, attorney's fees, and costs.

At some point, the clerk of the circuit court pointed out to the parties that no notice of appeal was filed on behalf of Dr. Ford. On June 13, 2014, Mr. Ford and Dr. Ford filed a motion to "determine parties to appeal from general sessions[.]" In their motion and accompanying memorandum, the Fords noted that both Mr. Ford and Dr. Ford had participated in the circuit court case for over a year without any confusion. As such, the Fords asked that the trial court enter an order clarifying that Dr. Ford was a proper party to the case.

On June 17, 2014, the Fords filed an answer to the Association's amended complaint and a counter-complaint. Therein, the Fords denied that the Association was entitled to any damages for unpaid assessments, as they alleged that the Association had in fact been overcharging for the assessments due to ambiguities in the CCRs that should be construed in the Fords' favor. The Fords also asserted that "some or all of [the Association's] costs and expenses are unnecessary and are not reasonably related to the collection of the assessments alleged due from the Fords." In addition, the Fords raised claims of negligent and intentional misrepresentation and breach of contract. Finally, the

Fords asserted that the intentional misrepresentation by the Association "constitutes outrageous conduct worthy of punishment through the assessment of exemplary damages." As such, the Ford sought an unspecified amount of damages due to the Association's allegedly tortious conduct.

The Association filed a response to the Fords' motion to determine the proper parties to the appeal on June 19, 2014. Therein, the Association noted that a notice of appeal was filed only on behalf of Mr. Ford, not Dr. Ford. Accordingly, the Association asked the trial court to enter an order finding that only Mr. Ford was a party to the appeal. On June 27, 2014, the trial court entered an order finding that only Mr. Ford had effectively appealed the general sessions judgment and therefore Dr. Ford was not a party to the appeal. The caption of the case was thereafter changed to reflect Mr. Ford as the sole defendant.[2]

The Association next filed an answer to Mr. Ford's counter-complaint on July 16, 2014, denying the material allegations contained therein. The Association's answer also raised affirmative defenses of, *inter alia*, the expiration of the statute of limitations and failure to plead certain claims with particularity. Shortly, thereafter, the Association filed a motion for partial summary judgment against Mr. Ford, arguing that Mr. Ford's counter-claims were barred by the statute of limitations and that the claims for intentional misrepresentation and outrageous conduct were not pled with particularity as required by Rule 9.02 of the Tennessee Rules of Civil Procedure. Mr. Ford responded in opposition to the motion for partial summary judgment on November 24, 2014.

The case was continued several times, nearly all of which occurred at Mr. Ford's request. One such continuance occurred when Mr. Ford's second attorney withdrew and Mr. Ford retained substitute counsel. During this time, the case was transferred to Division IV of Shelby County Circuit Court. On February 19, 2016, the trial court entered an order granting Mr. Ford "one (1) final continuance," setting trial for April 26, 2016, and ordering the parties to participate in mediation.

On April 4, 2016, Mr. Ford filed a motion regarding the proper interpretation of the CCRs as applied to Mr. Ford's property. The Association responded in opposition on April 19, 2016, asserting that the specific question presented by the motion "has no bearing upon the case." Both parties thereafter filed pre-trial briefs.

A trial occurred as scheduled on April 26, 2016. Robert Cox, the vice-president of the Association, first testified about the dispute between the Association and the Fords.

---

[2] The Fords asked the trial court to grant permission to seek an interlocutory appeal of its order excluding Dr. Ford as a party. *See* Tenn. R. App. P. 9 (involving interlocutory appeals by permission from the trial court and this Court). The trial court denied the motion by order of November 12, 2014. This dispute has not been raised as an issue on appeal. Consequently, we will not question the trial court's ruling that only Mr. Ford is a proper party to this case.

Mr. Cox acknowledged that Mr. Ford approached him in 2012 concerning what Mr. Ford considered an overcharge of assessments as to his property. Ultimately the parties were unable to amicably resolve the dispute, leading to this litigation. According to Mr. Cox, the litigation expenses in this case stemmed from the Association's need to respond to Mr. Ford's motions, the multiple continuances granted to Mr. Ford, and "Mr. Ford's lack of cooperation [throughout the litigation, which] has driven up the attorney's fees in this case[.]" Mr. Cox denied that he ever gave any assurances to the Fords that their property would be assessed as a single lot; according to Mr. Cox, he lacked the authority to make such an assurance. Mr. Cox admitted, however, that he could not know whether another Association board member or employee made such an assurance to the Fords. Mr. Cox further admitted that Mr. Ford had made some payments since 2012 on the assessment, but not the entirety of what the Association contended was owed.

Tamela Moss, an employee of the Association's management company testified regarding both the assessment allegedly owed by Mr. Ford and the costs associated with the litigation. According to Ms. Moss, the Fords were initially assessed for two lots, but it was later determined that he should be assessed on only 1.6 lots. At that time, Ms. Moss testified that the Association "went back and calculated, verified everything, and . . . did all the adjustments." Ms. Moss testified that Mr. Ford paid the assessment in full the first two years after the purchase of the property, but even after the assessment was reduced to reflect only a 1.6 Lot Share, Mr. Ford failed to make a full payment to the assessment after 2012. Instead, Mr. Ford only paid for one Lot Share. According to Ms. Moss, using the 1.6 Lot Share to calculate Mr. Ford's assessment, Mr. Ford owed unpaid assessments on Lot 1 in the amounts of $3,401.74 and $4,939.32. Ms. Moss admitted, however, that Mr. Ford made a payment of $1,175.00 on the Lot 1 assessment for which he had yet to be credited.

Ms. Moss also testified that the Association incurred costs of $2,500.00 from her management company relative to the litigation, which had apparently been included in Ms. Moss's prior $4,939.32 figure concerning the unpaid assessment on Lot 2. Ms. Moss explained that she "put in considerable over-time which [her] boss had to pay [her] for," as the dispute between the Association and the Fords "hijacked [her] work life." Ms. Moss testified that the Association was required to reimburse the management company for these costs, as the costs were related to the Association's effort to collect outstanding assessments. Ms. Moss admitted, however, that this was not a typical cost assessed to a homeowner, but was merely a result of the extensive litigation.

Ms. Moss next testified that the Association incurred legal fees of $68,018.75, which had been paid by the Association at the time of trial. Through Ms. Moss, counsel for the Association presented billed and paid invoices for legal fees totaling $68,018.75 and asked that the invoices be admitted into evidence. Counsel for Mr. Ford initially objected to the admission of the invoices on the basis that he had not been given the bills in discovery. The trial court thereafter granted Mr. Ford a short recess to allow his

counsel time to review the bills. At the resumption of trial, Mr. Ford's counsel stated that he had been able to superficially review the invoices. Mr. Ford's counsel did not renew his objection to the bills or offer any additional objections as to their admissibility. The invoices were therefore admitted as exhibits.

In contrast to the testimony of Mr. Cox and Ms. Moss, Mr. Ford testified that he should be assessed only a single Lot Share for his property. Specifically, Mr. Ford testified that although he was initially aware that his property "would be assessed two lot fees," Ms. Moss informed him prior to the closing on the property that he could easily obtain permission from the Association to only pay a single lot fee. Mr. Ford testified that based upon this assurance, he and Dr. Ford decided to purchase the property and address the proper calculation of the assessment "down the road." According to Mr. Ford, he and Dr. Ford paid fees on "two full lots" at the time of closing on the property and for a period of two years thereafter. Mr. Ford testified that he later sent a letter to the Association formally asking that he only be charged an assessment for a single lot. Mr. Ford testified that the Association admitted that it had made a mistake in assessing the Fords for two full lots, but refused to reduce the assessment to a single lot. Instead, the Association indicated that the Fords pay a full assessment on Lot 1 and a pro-rated assessment for Lot 2, reflecting the amount of Lot 2 actually owned by the Fords. Mr. Ford testified that even after the Association conceded that the Fords only owed an assessment on 1.6 lots, they received a letter from the Association requesting payment for two full Lot Shares.

Mr. Ford admitted that he and Dr. Ford own 1.6 lots. Mr. Ford asserted, however, that consideration of the lots was improper and that the assessment should instead be calculated by tract, of which the Fords only own one. After paying two full Lot Shares in 2010 and 2011, Mr. Ford testified that he asked that his 2012 assessment be calculated using only one Lot Share and also that he be credited in the amount of his prior overpayment. As a result, Mr. Ford testified that in 2012 and 2013 he only paid the amount owed for a single Lot Share after deducting the purported credit. Thereafter, in 2014, 2015, and 2016, Mr. Ford testified that he paid the assessment on one full Lot Share.

With regard to his counter-claim for breach of contract, Mr. Ford testified that he and Dr. Ford were initially informed that they were not required to mow the lawn on a portion of their property because it was wooded and shielded from view. After several years, however, Mr. Ford testified that the Association objected to the condition of the property and required the Fords to mow the area, leading to instances of trespass by children. In addition, Mr. Ford testified that after this dispute arose, the magnetic stickers that allowed the Fords to reach their property through The Estates' back gate were deactivated. Instead of using the back gate like other homeowners, the Fords were thereafter required to go through the front gate of The Estates. Mr. Ford further admitted that the underlying matter was not the only litigation in which he and the Association

were involved. First, Mr. Ford testified that the Association had filed another complaint against Mr. Ford in circuit court involving Mr. Ford's failure to maintain his property. It appears from the testimony at trial that this matter was resolved. Mr. Ford also testified that he had filed a complaint in chancery court against the Association alleging that the Association had racially discriminated against him. The record is unclear of the resolution of this lawsuit.

At the conclusion of Mr. Ford's testimony, Ms. Moss was recalled. Ms. Moss unequivocally denied that she had ever informed Mr. Ford that his property could be assessed as a single lot. According to Ms. Moss, that is not the Association's typical practice, having never allowed such a consolidation in the past, and she has no authority to determine the property assessment for a parcel of property. Ms. Moss also testified that the Fords' property was "consistently overgrown," which required the Association to file a separate lawsuit to force Mr. Ford to mow the lawn. Ms. Moss explained that the Association has a written delinquency policy indicating that the Association may suspend privileges to owners who have failed to pay their assessments. According to Ms. Moss, the suspension of privileges occurs frequently throughout the neighborhood and the Association has previously gone to great lengths to collect unpaid assessments from other owners.

The trial court issued an oral ruling at the conclusion of the proof, which ruling was incorporated into the trial court's May 9, 2016 final judgment. Therein, the trial court noted that the case had "a very lengthy history" and that there was no dispute that the Fords own one lot and sixty percent of a second contiguous lot or that all property in the Southwind neighborhood is subject to the CCRs including Annual Assessments. The trial court found that the CCRS provide that Annual Assessments were to "be assessed by lot," as defined by the "recorded subdivision plat." Because the trial court concluded that Mr. Ford owned 1.6 lots based upon the recorded subdivision plat, the trial court determined that Mr. Ford was responsible for Annual Assessments on 1.6 Lot Shares. As such, the trial court entered a total judgment against Mr. Ford for $7,166.06 for unpaid assessments. In reaching this award, the trial court deducted Mr. Ford's uncredited payment of $1,175.00 from the unpaid assessment on Lot 1, resulting in a net unpaid assessment on Lot 1 of $2,226.74   In addition, the trial court ruled that Mr. Ford owed $4,939.32 in unpaid assessments for Lot 2, which award included expenses charged by the Association's management company "for overtime hours associated with this case, a cost of collection to the Association[.]"

The trial court also dismissed Mr. Ford's counter-claims, finding that he failed to meet his burden of proof. In the trial court's ruling, it noted that the parties were "fairly sophisticated and knowledgeable" and that the parties had "full knowledge of what was being purchased." In addition, the trial court noted that the property purchased was "fairly expensive" leading the trial court to believe that Mr. Ford "had the wherewithal to get counsel . . . if he had wanted to [] spell out what he felt his rights were and what his

obligations would be." The trial court also mentioned the long-standing nature of the dispute and the fact that the dispute could have been resolved on multiple occasions as early as 2010 at the property closing. Finally, the trial court awarded the Association $66,892.25 in attorney's fees, which represented the Association's entire fee request less the fees accrued when the Association filed an objection to a discovery request. The trial court held that an award of attorney's fees was specifically authorized by the CCRs and that the large award was justified in this case in spite of the small amount of damages. Mr. Ford filed a timely notice of appeal.

## ISSUES PRESENTED

Mr. Ford raises four issues, which are taken and slightly restated from his brief:

1. Whether the trial court erred by finding that Mr. Ford failed to fully pay association assessments to the Association.
2. Whether the trial court erred in dismissing Mr. Ford's counter-claims.
3. Whether the trial court erred in its interpretation and application of Articles III and IV of the CCRs by awarding attorney's fees and costs related to instances not specified in the CCRs.
4. Whether the trial court abused its discretion in awarding attorney's fees to the Association.

## STANDARD OF REVIEW

In this appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is de novo. *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006) (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *4215 Harding Road Homeowners Ass'n. v. Harris*, 354 S.W.3d 296, 305 (Tenn. Ct. App. 2011); *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

## DISCUSSION

### I.

Mr. Ford first argues that the trial court erred in finding that Mr. Ford failed to pay the full assessment owed by him. Mr. Ford does not suggest that he is not bound by the assessment requirements of the CCRs or that he is not required to pay any assessment on his property. Instead, he argues that the trial court erred in its calculation of the assessment owed on Mr. Ford's property. This issue requires that we interpret the CCRs

and apply the calculation contained therein to Mr. Ford's property. "It is well settled that restrictive covenants are to be strictly construed, and, like other contracts, they will be enforced according to the clearly expressed intention of the parties." ***Baird v. Smith***, No. 01-A-01-9003-CH00094, 1990 WL 192713, at *1 (Tenn. Ct. App. Dec. 5, 1990) (quoting ***Benton v. Bush***, 644 S.W.2d 690 (Tenn. Ct. App. 1982)). The construction of restrictive covenants is therefore a question of law not entitled to a presumption of correctness on appeal. ***Hughes v. New Life Dev. Corp.***, 387 S.W.3d 453, 481 (Tenn. 2012). As explained by this Court:

> Because the instant case involves the interpretation of restrictive covenants, we apply well-established rules of construction and law in order to construe the terms of the covenants. ***Parks v. Richardson***, 567 S.W.2d 465, 467 (Tenn. Ct. App. 1977). . . . Thus, if the "meaning of the covenant is reasonable and unambiguous, there is no need to seek further clarification outside its language." ***Shea v. Sargent***, 499 S.W.2d 871, 874 (Tenn. 1973). If the language of the restrictive covenant is unambiguous, and its plain meaning is fair and reasonable, then its terms may not be altered or varied by parol evidence. ***Hicks***, 978 S.W.2d at 547–48 (citations omitted). However, if [parol evidence is] needed, then we would also interpret [the covenants] in compliance with the well-established rules governing interpretation of other written contracts, where the primary goal is to ascertain the intention of the parties as expressed by the language of the document itself. *See **Hicks v. Cox***, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998). The words of a contract must be given their usual and ordinary meaning. ***Hicks***, 978 S.W.2d at 547 (citing ***Aldridge v. Morgan***, 912 S.W.2d 151, 153 (Tenn. Ct. App. 1995); ***Rainey v. Stansell***, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992)).

***Grand Valley Lakes Prop. Owners Ass'n, Inc. v. Burrow***, 376 S.W.3d 66, 78 (Tenn. Ct. App. 2011). Because restrictive covenants "are in derogation of the right to free use and enjoyment of property[,]" Tennessee Courts will resolve "[a]ny doubt concerning the applicability of a restrictive covenant . . . against the restriction." ***Hughes***, 387 S.W.3d at 481 (Tenn. 2012) (citing ***Williams v. Fox***, 219 S.W.3d 319, 324 (Tenn. 2007); ***Massey v. R.W. Graf, Inc.***, 277 S.W.3d 902, 908 (Tenn. Ct. App. 2008)). "When the terms of a covenant may be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property." *Id.* (citing ***Williams***, 219 S.W.3d at 324).

Accordingly, we first consider the language of the CCRs. According to Article IV, Section 4.3 of the CCRs: "Each Member by acceptance of a deed or other conveyance to Member's Property, whether or not it shall be so expressed in any such deed or other conveyance, shall be deemed to covenant and agree to pay [the

Association] the Annual Charges." In turn, Article III, Section 3.2 of the 1995 Amendment to the CCRs provides:

> For the purpose of providing funds for use as specified in Article V hereof, the Board shall, in each calendar year commencing with the year 1995, assess against the Assessable Property the Annual Charges (as hereinafter defined) to meet its annual expenses which shall be estimated by the Board (Estimated Annual Expenses) in order to bill the Members in a timely fashion.
>
> The Board shall separately assess each Parcel as provided herein, and each such Parcel shall be charged with and subject to a lien for the amount of such separate assessment which shall be deemed the "Annual Charge" with respect to such Parcel.

Section 3.2 of the 1995 Amendment goes on to detail the specific calculation used in computing an owner's "annual charge" by taking into account the numbers of homes and lots in the neighborhood and the estimated expenses of the Association to determine each owner's "Lot Share." The calculation provides differing assessment calculations for homes and lots and indicates that that each non-excluded lot pays a Lot Share "until assessed as home." Finally, the term "lot" is defined as "a lot in a recorded subdivision plat (i.e., recorded prior to the recording of this Amendment) in the Southwind Property[.]"

Thus, the CCRs make clear that assessments should be charged separately for "each [p]arcel." The term "parcel" however, is defined by the CCRs only as including "Residential Parcel[s]" and offers no express clarification of whether contiguous tracts made up of more than one originally platted lot should be assessed as a single parcel or as multiple parcels.[3] Mr. Ford argues that his property should be assessed as a single parcel because it constitutes only a single "tract." Indeed, there is no dispute that Mr. Ford's property constitutes a single tract as defined by the CCRs, which define a tract as "[a] contiguous piece of property under one ownership." The Association argues, however, that the fact that Mr. Ford owns only a single tract is irrelevant because "the Amended CCRs do not consider tracts when assessing property."

Mr. Ford agrees that the Amended CCRs make no mention of tracts in the calculation of the assessment. According to Mr. Ford, however, because the Amended CCRs also provide no specific rules for the calculation of assessments on partial lots, the Amended CCRs are rendered ambiguous and consideration of other sources to determine this issue is necessary. Specifically, Mr. Ford asks this Court to consider the CCRs prior

---

[3] "Residential Parcel" is defined as "[a]ny unit, lot, part, or parcel of Southwind Property designed for a single family residence . . . regardless of whether a dwelling has or has not been constructed on such lot."

to the 1995 Amendment, which provided that the annual charge was to be determined based upon each parcel's "Market Valuation." In turn, "Market Valuation" was defined as "the highest appraised or market value placed on a particular Parcel or **Tract** of Southwind Property, including land and improvements." (Emphasis added). Thus, Mr. Ford argues that the original CCRs contemplated that Annual Assessments were to be calculated based upon the number of tracts owned. Because there is no dispute that Mr. Ford owns only a single "tract," as that term is defined in the CCRs, Mr. Ford contends he owes an Annual Assessment for only a single parcel or Lot Share.

Respectfully, we cannot agree with Mr. Ford's interpretation of the Amended CCRs. Here, as previously discussed, there is no dispute that the CCRs as amended in 1995 are applicable in this case. Accordingly, we apply the plain language of the Amended CCRs unless an ambiguity requires that we consider parole evidence, such as the CCRs as they existed prior to the 1995 Amendment. *See Grand Valley Lakes*, 376 S.W.3d at 78. In making this determination, we keep the following principles in mind:

> All clauses and provisions of the contract should, if possible, be so construed as to harmonize with one another, and all the language of a contract should be construed so as to subserve, and not subvert, the general intention of the parties. The whole agreement should, if possible, be construed so as to conform to an evident consistent purpose.

*State ex rel. Neff v. Cotton Belt Ins. Co.*, No. 87-101-II, 1987 WL 28386, at *6 (Tenn. Ct. App. Dec. 23, 1987).

We agree with Mr. Ford that the calculation of Annual Assessments under the Amended CCRs is not a model of clarity. From our review, however, the plain language of the Amended CCRs as a whole clearly evinces an intention to utilize lots, rather than tracts, in determining a property owner's parcel for purposes of the Annual Assessment. First, we note that the term "Residential Parcel," as defined by the CCRs, expressly includes "lot[s]," rather than tracts. Indeed, a clear intention to utilize lots rather than tracts in the calculation of Annual Assessments is manifest throughout the Amended CCRs. As previously discussed, the calculation provided by the 1995 Amendment specifically determines a homeowner's "Lot Share." The Amended CCRs later explain that the "Annual Charge **for each Lot** shall be a Lot Share." (Emphasis added). Moreover, when discussing the timeline for payment of the Annual Assessment, the Amended CCRs specifically state that "[t]he Annual charge **for each Lot** shall first become due upon the earlier of" several contingencies. (Emphasis added). Additionally, the 1995 Amendment includes a specific definition of the term "lot," mandating that a lot be determined by a previously recorded subdivision plat. In contrast, the term "tract" is simply not mentioned in the discussion of the Annual Assessment in the Amended CCRs. Clearly, then, the CCRs contemplate that the Annual Assessment will be calculated based

- 11 -

upon the lot or lots owned by the property owner, rather than the number of contiguous tracts.

Given this clear intention, we cannot agree with Mr. Ford's contention that we must instead utilize specifically superseded language from the original CCRs simply because the Amended CCRs do not expressly address partial lots. As this Court has stated, both "common sense and [the] probable intention of the parties are the guides to the construction of a written instrument[.]" ***Taylor v. Universal Tire, Inc.***, 672 S.W.2d 775, 779 (Tenn. Ct. App. 1984) (citing ***Stop & Shop, Inc. v. Ganem***, 347 Mass. 697, 200 N.E.2d 248 (Mass. 1964)); *see also **Dattel Family Ltd. P'ship v. Wintz***, 250 S.W.3d 883, 892 (Tenn. Ct. App. 2007) (holding that the court "is not required to check common sense at the courthouse door"). Here, the Amended CCRs clearly state that Annual Assessments are to be calculated based upon lots. Thus, common sense dictates that, where a property owner's "tract" includes land from more than one of the original lots as defined by the recorded subdivision plat, the property owner's Annual Assessment will also be calculated based upon more than a single lot or Lot Share. Indeed, Mr. Ford admits in his brief to this Court that the original CCRs prior to the 1995 Amendment likewise fail to "define partial lots or provide a calculation for a 'Partial Lot Share.'" As such, Mr. Ford's contention that we should look to the original CCRs to resolve this dispute and hold that he should pay only the Annual Assessment for a single "tract" is unavailing.

Based on the foregoing, we conclude that the trial court did not err in interpreting the Amended CCRs as requiring that Mr. Ford's Annual Assessment be determined based upon the number of lots he owns. Mr. Ford admitted at trial that based on the previously recorded subdivision plat applicable to this matter, he owns 100% of one lot, as well as 60% of a second lot. The trial court's calculation of Mr. Ford's assessment based upon his ownership of 1.6 lots is, therefore, affirmed.

## II.

Mr. Ford next argues that the trial court erred in dismissing his counter-claims. As previously discussed, in his counter-complaint, Mr. Ford asserted claims of intentional and negligent misrepresentation, as well as breach of contract. As an initial matter, however, we must discuss the deficiencies in Mr. Ford's brief. Pursuant to Rule 27 of the Tennessee Rules of Appellate Procedure, all briefs filed by appellants must include:

> An argument, which may be preceded by a summary of argument, setting forth:

> (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require

appellate relief, **with citations to the authorities** and appropriate references to the record (which may be quoted verbatim) relied on; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues); . . . .

Tenn. R. App. P. 27(a)(7) (emphasis added). Based upon this rule, this Court has repeatedly held that the failure to cite authority in support of arguments or "to construct an argument regarding [a] position on appeal" constitutes a waiver of the issue on appeal. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006); *see, e.g.*, *Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011); *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001); *Bean v. Bean*, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000). In addition, "where a party . . . merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010).

This section of Mr. Ford's brief contains the required statement regarding the purported standard of review applicable here, citing *Konvalinka v. Chattanooga-Hamilton County Hospital Authority*, 249 S.W.3d 346 (Tenn. 2008). The cited portion of *Konvalinka* concerns the abuse of discretion standard applicable in reviewing findings of civil contempt. *Id.* at 358. Fortunately for Mr. Ford, the stringent abuse of discretion standard is simply not applicable to the trial court's finding that Mr. Ford failed to meet his burden on his various counter-claims. Instead, as previously discussed, the trial court's ruling is reviewed de novo with a presumption of correctness for the trial court's findings of fact. *See* Tenn. R. App. P. 13(d).

Unfortunately for Mr. Ford, however, this inapplicable standard of review is the only authority cited in this portion of his appellate brief. Although Mr. Ford raised claims in his counter-complaint regarding misrepresentation, breach of contract, and outrageous conduct and asserts that the trial court erred in dismissing these claims, absolutely no authority is cited in any form to support Mr. Ford's argument that these claims were improperly dismissed. Without citation to legal authority, these arguments are waived. *See Sneed*, 301 S.W.3d at 615; *Newcomb*, 222 S.W.3d at 401.

Even assuming, arguendo, that these claims are not waived by Mr. Ford's complete failure to cite legal authority in support of his argument, we conclude that Mr. Ford has not shown that the trial court erred in dismissing these claims as unsupported by the evidence. For example, Mr. Ford's misrepresentation claims rest on his assertion that Ms. Moss informed him that after his purchase of the subject property, he would be able to obtain permission for it to be assessed as a single lot. *See Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (requiring as an element of intentional misrepresentation that the defendant made a false representation of existing or past fact); *Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct.

- 13 -

App. 2009) (requiring as an element of negligent misrepresentation that the defendant supplied false information to the plaintiff). Ms. Moss, however, unequivocally denied ever having made that assertion to Mr. Ford. Because of the starkly contradicting testimony on this issue, the trial court was required to resolve the dispute based, at least in part, on the relative credibility of the witnesses. This Court, however, "will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Mr. Ford has simply not shown that the trial court erred in assessing the parties' relative credibility on this issue or in dismissing his misrepresentation claims.

The same is true of Mr. Ford's breach of contract claim. In his counter-complaint and at trial, Mr. Ford asserted that the Association breached its contract with Mr. Ford by denying him the benefits of membership allowed to other members, such as access to the property through The Estates' back gate. Again, no law is cited to support Mr. Ford's assertion that this restriction constituted a material breach of the parties' contract. Furthermore, Mr. Ford admitted at trial that the Association Bylaws allow the Association to suspend the membership rights of any owners who have unpaid assessments.[4] Indeed, Ms. Moss testified that the membership rights of multiple owners were restricted due to unpaid assessments and that Mr. Ford, while restricted in the manner in which he could reach his property, was never denied access to his property. Moreover, although Mr. Ford asserted at trial that a breach of contract occurred when the Association required Mr. Ford to mow his unimproved lot, there can be no dispute that the CCRs clearly provide that parcels and their improvements be kept in good repair, including "mowing of all lawns," without exception for unimproved parcels. Under these circumstances, and given the lack of legal authority cited on this issue, we likewise conclude that the trial court did not err in dismissing Mr. Ford's breach of contract claim.

Finally, we note that although they were not designated as counter-claims in his counter-complaint, Mr. Ford argues that the trial court erred in dismissing his claim that the Association was guilty of unclean hands and that he had paid his debt through accord and satisfaction. Instead, both arguments were presented by Mr. Ford as defenses to the Association's collection efforts. Again, no law is cited in Mr. Ford's brief to support either argument. Given the fact that Mr. Ford confined his issue on appeal to the dismissal of his counter-claims and no legal authority is cited to support Mr. Ford's arguments on these defenses, we will not address these arguments in this appeal.

**III.**

---

[4] Mr. Ford's testimony indicated that he did not believe that the 2009 Association Bylaws were applicable to him, despite having been adopted prior to his purchase of the subject property. Mr. Ford does not raise this argument on appeal; in fact, Mr. Ford does not mention the Association Bylaws in this portion of his appellate brief.

Mr. Ford finally argues that the trial court erred in awarding the Association attorney's fees and costs, arguing both that the award of attorney's fees and costs was not authorized by the CCRs and that the award was excessive. We begin first by addressing whether the attorney's fees and costs awarded in this case were authorized by the CCRs, which provide in relevant part: "Each such assessment, together with interest and costs of collection, including reasonable attorney's fees, shall be a personal obligation of the person who was the owner of such Member's Property at the time when the assessment fell due." "Though normally review of an award of attorney's fees is subject to an abuse of discretion standard," where the parties dispute the trial court's "interpretation and application of a contractual provision allowing for attorney's fees[,]" our review is de novo. **Clark v. Rhea**, No. M2002-02717-COA-R3-CV, 2004 WL 63476, at *2 (Tenn. Ct. App. Jan. 13, 2004).

Mr. Ford argues that the attorney's fees incurred in this case are not properly categorized as "costs of collection," because the fees awarded by the trial court include fees incurred in the defense of two separate lawsuits, "[n]either [of which] involves the collections of assessments, nor [are] reasonably related to the collection of assessments in the present action." Typically, we would agree with Mr. Ford that costs incurred in separate litigation not related to this collection action cannot be categorized as costs of collection for purposes of the CCRs. Here, however, Mr. Ford failed to preserve any objection to specific charges included in the attorney's fee award.

As previously discussed, during trial, counsel for the Association attempted to introduce invoices showing the Association's $68,018.75 legal bill into evidence. Counsel for Mr. Ford properly objected, noting that he had not been given sufficient time to review the invoices. The trial court appropriately allowed Mr. Ford's counsel an opportunity to review the bills. Although Mr. Ford asserts that the bills were later entered "[o]ver the continued objections" of Mr. Ford, we respectfully cannot agree with this characterization. First, we note that Mr. Ford's assertion that there was a continuing objection to the invoices in his appellate brief is not supported by any citation to the record. Rule 6 of the Rules of the Court of Appeals of Tennessee specifically provides that:

Written argument in regard to each issue on appeal shall contain:

(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.
(2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.

(3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.

(4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

R. Tenn. Ct. App. 6(a). Clearly, Mr. Ford failed to comply with Rule 6 in asserting that a continuing objection was made without providing this Court "with citation to the record where the erroneous or corrective action is recorded." *Id.*

Our review of the record reveals that no such continuing objection was ever made to the invoices. It appears from the record that counsel for Mr. Ford indeed objected to the invoices when they were first introduced. After the recess to allow counsel time to review the documents, however, the following exchange took place:

THE COURT: . . . First of all, have you had a chance to look at that [Counsel], not as thoroughly as you'd like to, but did you have a chance to review it?

[Mr. Ford's Counsel]: I think Your Honor stated it exactly correct. For the record, I have not had a chance to review it like I would have normally reviewed it in the file, but I have reviewed it.

When the witness was subsequently asked about the total amount of attorney's fees incurred by the Association, counsel for Mr. Ford did not object to the $68,018.75 figure reflected in the invoices, despite his argument now that that amount was inflated by fees associated with other lawsuits. Indeed, at no point during the trial did Mr. Ford or his counsel assert that certain of the invoices were not properly included in the costs associated with this action. Where this issue was never called to the trial court's attention through a proper contemporaneous objection, we will generally not find error in the trial court's failure to separate the charges. *See* **Watson v. City of Jackson**, No. W2013-01364-COA-R3-CV, 2014 WL 4202466, at \*5 (Tenn. Ct. App. Aug. 26, 2014) ("It is well-settled that the failure to raise a contemporaneous objection to the admission of evidence at the time the evidence is introduced at trial results in waiver of the particular issue on appeal.") (quoting **McGarity v. Jerrolds**, 429 S.W.3d 562, 567 (Tenn. Ct. App. 2013)). Rather, "[a] party . . . who fails to take reasonable steps to cure an error[] is not entitled to relief on appeal." **Watson**, 2014 WL 4202466, at \*5 (quoting **State Dept. of Children's Servs. v. V.N.**, 279 S.W.3d 306, 319 (Tenn. Ct. App. 2008)).

Because of Mr. Ford's lack of objection to specific invoices, even he admits in his brief to this Court that "[i]t may be that this Court does not have an adequate record before it to find one way or the other" whether the attorney's fees awarded include work done on separate matters. Indeed, even if Mr. Ford's failure to make specific objections at trial was excused by the fact that the invoices were not provided to Mr. Ford in a timely

- 16 -

manner, there is simply no justification for Mr. Ford's failure once again to point out the specific charges that are not attributable to the underlying litigation. Instead, Mr. Ford points to only a single invoice as likely unrelated to the subject litigation. Respectfully, "'judges are not like pigs, hunting for truffles' that may be buried in the record, . . . or, for that matter, in the parties' briefs on appeal." *Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 616 (Tenn. Ct. App. 2015), *perm. app. denied* (Tenn. Oct. 16, 2015) (quoting *Flowers v. Bd. of Professional Responsibility*, 314 S.W.3d 882, 899 n.35 (Tenn. 2010)) (citation omitted). The incubus therefore does not rest on this Court to comb through the seventy pages of invoices to delineate between charges that were properly included in this matter and those that were not. Given Mr. Ford's failure to timely and properly raise this issue at trial, as well as his failure to delineate which of the "numerous entries . . . address matters outside the purview of this collections case," we conclude that Mr. Ford cannot now argue that improper charges were included in the trial court's award.

Mr. Ford also argues that the trial court erred in awarding the Association $2,500.00 in overtime and other expenses that the Association asserted it was required to incur to prosecute this action. As previously discussed, Ms. Moss testified at trial that the Association incurred considerable expenses beyond the Association's normal operating costs because of the time Ms. Moss and her employer were required to expend on this case. Again, Mr. Ford did not object to either the testimony from Ms. Moss on this subject or the invoices presented as evidence of the charges. Moreover, Mr. Ford cites no law suggesting that costs incurred by a management company in the prosecution of a homeowner's association's lawsuit for homeowner's dues do not constitute costs of collection. Under the particular circumstances of this case, we decline to rule that the trial court erred in awarding the Association $2,500.00 in costs incurred in prosecuting this action.

Mr. Ford next argues that the trial court erred in awarding the Association $66,892.25 in attorney's fees because this amount is unreasonable under the circumstances. Where a contract provides for attorney's fees, "the amount of the fee must be reasonable, even if the contract does not so require." *First Peoples Bank of Tenn. v. Hill*, 340 S.W.3d 398, 410 (Tenn. Ct. App. 2010) (citing *Jerry T. Beech Concrete Contractor, Inc. v. Larry Powell Builders, Inc.*, No. M2001-02709-COA-R3-CV, 2003 WL 726955 at *3 (Tenn. Ct. App. Mar. 4, 2003)). The trial court is therefore entitled to exercise its discretion in determining the amount of attorney's fees to award. *Shamblin v. Sylvester*, 304 S.W.3d 320, 331 (Tenn. Ct. App. 2009); *Chaffin v. Ellis*, 211 S.W.3d 264, 291 (Tenn. Ct. App. 2006); *Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530 (Tenn. Ct. App. 2002); *Fell v. Rambo*, 36 S.W.3d 837 (Tenn. Ct. App. 2000).

Rule 1.5 of the Rules of Professional Conduct outlines the appropriate considerations for determining the reasonableness of an attorney fee award. These considerations include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
(8) whether the fee is fixed or contingent;
(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
(10) whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5.

Mr. Ford argues on appeal that the trial court erred in failing to consider the above factors in awarding the Association more than $60,000.00 in attorney's fees. Here, the trial court did make some findings that are relevant to the attorney's fees award, including the long duration of the dispute between the parties and the parties' relative sophistication. The Association argues that these findings, coupled with Mr. Ford's contumacious conduct throughout the proceedings, justify the award in this case. Respectfully, we cannot agree.

From our review, the trial court's ruling makes no mention of many of the factors outlined under Rule 1.5. While the trial court's order states that the trial court "is aware" of the "amount involved" in this case, the trial court provides no specific explanation for the large attorney's fee award relative to the small recovery by the Association in this case. Tenn. Sup. Ct. R. 8, RPC 1.5(4). Additionally, although the invoices contained in the record on appeal reflect charges up to $300.00 per hour, the trial court made no finding as to "the fee customarily charged in the locality for similar legal services[.]" Tenn. Sup. Ct. R. 8, RPC 1.5(3). Most importantly, neither the trial court's oral ruling, nor its written order, contains any finding that the award is reasonable under the circumstances. As we have explained:

> When the trial court has exercised its discretion in light of the appropriate factors and found the fee to be reasonable, we simply review for abuse of discretion. . . . Where, however, there is no finding that the fee is reasonable, and no way to ascertain whether the court made the award in light of the appropriate factors, there is no way for us to accord the normal deference to the trial court.

- 18 -

***First Peoples Bank***, 340 S.W.3d at 410. Where this Court is unable to discern whether the trial court actually evaluated the amount of the fee to see if it is reasonable in light of the appropriate factors, the correct approach is to vacate the award and "remand [the] case to the trial court for a new determination of an attorney's fee award under [Supreme Court Rule 8, RPC 1.8] and the applicable case law." ***Ferguson Harbour Inc. v. Flash Market, Inc.***, 124 S.W.3d 541, 553 (Tenn. Ct. App. 2003). Because the trial court's oral and written rulings provide this Court with no illumination as to whether it considered the reasonableness of the requested fee in light of the factors outlined in Rule 1.5, we must likewise vacate and remand this case with instructions to consider the reasonableness of the fee awarded under the circumstances of this case and the applicable factors.

## CONCLUSION

The judgment of the Circuit Court of Shelby County is affirmed in part, vacated in part, and remanded to the trial court solely to determine whether the $66,892.25 attorney's fee award is reasonable in light of the appropriate factors. Costs of this appeal are taxed one-half to Appellant Kelvin Ford, and his surety, and one-half to Appellee Southwind Residential Properties Association, Inc., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE